**NOT INTENDED FOR PRINT PUBLICATION**

| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY<br><br>**Caption in Compliance with D.N.J. LBR 9004-2**(c) | **FILED**<br>JAMES J. WALDRON, CLERK<br><br>**February 3, 2009**<br><br>U.S. BANKRUPTCY COURT<br>NEWARK, N.J.<br>BY: _s/ Margaret Cohen,_ DEPUTY |
| In re<br><br>BAYONNE MEDICAL CENTER, INC.,<br><br>        Debtor. | Case No.:     07-15195 (MS)<br><br>Chapter 11 |
| IJKG LLC, IJKG OPCO LLC AND IJKG PROPCO LLC,<br><br>        Plaintiff,<br><br>v.<br><br>BAYONNE MEDICAL CENTER, INC., AETNA US HEALTHCARE, THE BANK OF NEW YORK, As Master Trustee, and FINANCIAL SECURITY ASSURANCE, INC.,<br><br>        Defendants. | Adv. Pro. No. 08-1540 (MS) |

**O P I N I O N**

**APPEARANCES**

FOX ROTHSCHILD LLP
Hal L. Baume, Esq.
Thomas A. Cunniff
997 Lenox Drive, Bldg. 3
Lawrenceville, NJ  08648
*Attorneys for Plaintiffs*

EDWARD A. CIENKI, ESQ.
460 South White Horse Pike
P.O. Box 1235
Hammonton, NJ  08037
*Attorneys for Plaintiffs*

CONNELL FOLEY, LLP
Philip William Allogramento, Esq.
Stephen V. Falanga, Esq.
85 Livingston Avenue
Roseland, NJ  07068
*Attorneys for Defendant, Bayonne Medical
Center, Inc.*

McELROY, DEUTSCH, MULVANEY
& CARPENTER
Jeffrey Bernstein, Esq.
Three Gateway Center
100 Mulberry Street
Newark, NJ  07102
*Attorneys for Aetna US Healthcare*

COLE, SCHOTZ, MEISEL, FORMAN
& LEONARD
Gerald H. Gline, Esq.
25 Main Street
Hackensack, NJ  07601
*Attorneys for Financial Security
Assurance, Inc.*

RIKER DANZIG SCHERER HYLAND
 & PERRETTI
Curtis M. Plaza, Esq.
J. Alex Kress, Esq.
One Speedwell Avenue
Headquarters Plaza, P.O. Box 1981
Morristown, NJ  07962
*Attorneys for The Bank of New York,
as Master Trustee*

SILLS CUMMIS
Boris I. Makovetskiy, Esq.
Charles N. Panzer, Esq.
One Riverfront Plaza
Newark, NJ  07102
*Attorneys for The Official Committee of
Unsecured Creditors*

# TABLE OF CONTENTS

Page

I.    The Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.   Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    A.    Authorization to Pay 2004 Settlement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    B.    Security Interest in Gross Receipts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    C.    Court Approval of Assignment of Medicare Provider Number . . . . . . . . . . . . . 14

    D.    The Besler Settlement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    E.    IJKG's Effort to Enjoin CMS Charge Backs . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

III.  Determination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    A.    Twombly Standard and Record for Determination of Motions . . . . . . . . . . . . . 22

    B.    Plaintiffs' Count One Breach of Contract Claims . . . . . . . . . . . . . . . . . . . . . . . 24

        1.    The IJKG Covenant To Obtain a New Provider Agreement
            and Number . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
        2.    Context and Equitable Considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
        3.    Years 2002-2008 (through 1/31/08, excluding 2004) . . . . . . . . . . . . . . 29
        4.    CMS 2004 Repayment Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
        5.    Summary - Count One Dismissal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    C.    Plaintiff's Count Two Breach of Duty of Good Faith and Fair Dealing . . . . . . . 31

    D.    Count Three Claim of Promissory Estoppel; Count Four Claim of
        Unjust Enrichment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

    E.    Count Five: Equitable Subrogation to the Rights of Medicare . . . . . . . . . . . . . 37

IV.   Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

**HONORABLE MORRIS STERN,**
**United States Bankruptcy Judge**

      This Court has heard three generally parallel motions to dismiss the complaint in the captioned adversary proceeding, all pursuant to FED. R. BANKR. P. 7012(b), incorporating FED. R. Civ. P.12(b)(6).  The complaint seeks an array of remedies against the movants, all arising out of or related to plaintiffs' purchase of the assets of a hospital in a Chapter 11 case.[1]  While it was clear that the understanding of the parties-in-interest, in terms of contractual intent and text, was that liabilities arising out of Medicare overpayments to the hospital which accrued up to the time of the closing of the asset sale were to remain with the debtor/hospital, events in the postcontract preclosing period came to affect the intended result.  More specifically, the plaintiff-purchaser undertook to function under the old hospital's Medicare provider number, rather than obtain its own "new" number.  The circumstances of that undertaking are central to the current dispute, given that *Medicare* shall not distinguish between the old and new hospital entities, thus exposing the plaintiff-purchaser to potential Medicare claims for overpayment going back, now, to 2002.  Yet, the only audited and liquidated claim of Medicare arising out of the preclosing period relates to a settled amount for overpayments arising in the year 2004.  Whether other claims actually materialize is unknown at this point; indeed, it is conceivable that there shall be amounts *due to the provider* for preclosing periods, raising the specter of *Medicare* directing

---

[1]Debtor's voluntary petition was filed April 16, 2007 (the "Petition Date"); the sale of assets closed effective February 1, 2008.

1

refunds, contrary to the purchase agreement approved by the Court, to the current Medicare

provider number holder.

Complicating the dispute are: (i) distinctions under the Bankruptcy Code between

*prepetition* and *postpetition* cost report claims of Medicare; (ii) setoff rights of Medicare (i.e.,

debiting potential overpayment claims against refunds due the provider), as impacted by both the

Code and by law and regulations applicable to Medicare;[2] (iii) unknown potential exposure

derived from yet unaudited Medicare cost reports of the debtor/hospital, originally thought to be

open for years 2005 through the asset sale closing of January 31, 2008, now having been

reopened back to at least 2002; (iv) anticipated extraordinary delay in Medicare's determination

of "due to" and/or "due from" the provider based upon cost reports for preclosing periods (in

fact, the process could take a year or a number of years); (v) Medicare not being named a party

to this adversary proceeding (though it has pending, *at least for the moment,* a proof of claim for

the liquidated 2004 year overpayment and potentially for all other yet unaudited or otherwise

"open" years); (vi) rights of secured creditors to "Gross Receipts" of the debtor/hospital

(including rights of these creditors arising from use of their prepetition cash collateral,

allegations of diminution of that collateral during the Chapter 11 case, and recent settlement of

the cash collateral diminution dispute over the objection of the plaintiffs herein); and (vii) the

debtor/hospital's recognition of the "critical vendor" status of Medicare as evidenced by its

---

[2]This Court is guided by *In re Univ. Med. Ctr.*, 973 F.2d. 1065 (3d Cir. 1992), as it applies to Medicare cost report claims in bankruptcy, including Medicare's equitable recoupment and setoff rights, and the effect of assumption of provider agreements on such rights. *But see* (as to contrary view of recoupment rights of Medicare), *In re Slater Health* Ctr., 398 F.3d 98 (1st Cir. 2005); *In re Holyoke Nursing Home, Inc.*, 372 F.3d 1 (1st Cir. 2004); *In re TLC Hosps., Inc.*, 224 F.3d 1008 (9th Cir. 2000); *United States v. Consumer Health Servs. of Am., Inc.*, 108 F.3d 390 (D.C. Cir. 1997).

successful application to this Court at the threshold of the Chapter 11 case for authorization to

continue making periodic postpetition payments toward the settlement of Medicare's 2004

prepetition claim for overreimbursement, then the debtor's ceasing of such payments a month or

so after the closing of the asset sale, and the resulting undertaking by the current holder of the

provider number, as demanded by Medicare, to make good on some six monthly installments left

unpaid by the debtor/hospital on the 2004 settlement.

I.      **The Complaint.**

On or about May 15, 2008, the plaintiffs filed the *Complaint to: (i) Determine Breach of

Contract Claims; (ii) Escrow Funds; (iii) Obtain a Declaratory Judgment; and (iv) Obtain Other

Relief*.  Named defendants include:  Bayonne Medical Center, Inc. (the "debtor" in the captioned

Chapter 11 case), the Bank of New York, as Master Trustee ("Master Trustee") and Financial

Security Assurance, Inc. ("FSA"), in combination sometimes referred to herein as the "secured

creditors," or the "secured parties," and Aetna US Healthcare, claims against which are not the

subject of the motions under consideration here.  The plaintiffs are IJKG, LLC, and its affiliates,

the purchasers of the debtor's assets, herein all referred to as "IJKG."

On or about July 22, 2008, the Complaint was amended.  It is the First Amended

Complaint which is now deemed to be the target of the Rule 12(b)(6) motions at hand.  The

six-count pleading alleges causes of action and seeks relief, as follows:

1.      Count One claims breach of contract by *the debtor*, and, among other relief, seeks

        damages for the 2004 cost report settlement, and an escrow by the debtor of at

        least $3,000,000 ("from funds of the Debtor or other property of the Estate that

        Debtor has collected or will collect") for other preclosing Medicare cost report

exposure of IJKG; in the alternative, IJKG seeks postclosing Medicare proceeds received by the debtor (including postclosing receipts from a certain "Besler Settlement"); IJKG also seeks an administrative expense claim as part of its multiple relief requests.[3]

2.      Count Two asserts a cause of action against *the debtor* for breach of duty of good faith and fair dealing, and relief identical to that sought in Count One.

3.      Counts Three and Four recite causes of action "against Defendants"[4] (promissory estoppel and unjust enrichment, respectively), relief parallel to that sought in Counts One and Two, *except* that Count Four (unjust enrichment) seeks the alternative remedy of a constructive trust imposed "on all funds received by Debtor post-closing related to Debtor's Medicare Provider Agreement."

---

[3]Two claims which do not relate to Medicare are pled by IJKG as an element in each of the complaint's first five counts. At ¶¶ 52-60 of the complaint, IJKG alleges that the debtor was contract bound to pay certain transition service contractors ("Smart Solutions" and "Armanti"). IJKG also claims that it is exposed to liability for certain employee obligations (accruing preclosing and for employees of the debtor not hired by IJKG, other than particular assumed collective bargaining agreement obligations). *See* ¶¶ 61 and 62 of the complaint. The Court is not satisfied that such issues are sufficiently clear (nor adequately joined) by the adverse parties; moreover, at oral argument there was apparent confusion among the parties as to these claims and a rank failure in communication. Perhaps summary judgment motions would better position the Court to decide these issues if the parties are unable to "straighten out" their relative positions and settle issues. In any event, as pled the claims have plausibility at least as a purported breach of contract and will not be dismissed. If proven, IJKG's transition service claims and employee-based claims would appear to be administrative, for which funds are represented to be available. No extraordinary or equitable remedy would be necessary or justified.

[4]IJKG has clarified that "Counts I through IV of the First Amended Complaint are not directed at FSA or the Master Trustee." *See* IJKG's objection to the motion of the secured creditors (docket entry no. 10 in adversary proceeding at p.8).

4

4.      Count Five claims rights of equitable subrogation (i.e., that IJKG should be

subrogated to the rights of Medicare) seeking judgment "against Defendants,"

asserts that IJKG rights "are senior to any liens held by Secured Creditors on

Debtor's receivables or other revenue" (¶ 100), and that it is "entitled to recover

from the Secured Creditors the amounts of any payments IJKG makes related to

the pre-Closing Cost Reports" (¶ 101), and varies earlier relief requests to include

an escrow "from funds of Debtor or other property of the Estate that Debtor has

collected or will collect, or *has been turned over to or is in the possession of*

*Secured Creditors*," or that a constructive trust be imposed "on all funds received

by Debtor *and/or Secured Creditors* post-closing related to Debtor's Medicare

Provider Agreement"[5] (emphasis added).

The debtor, FSA and the Master Trustee now each move to dismiss the complaint.[6]

## II.   Facts.[7]

The debtor owned a hospital in Bayonne, New Jersey, which encountered extraordinary

financial reversals.  Yet it maintained a vital place in the healthcare delivery system in its

community.  The debtor filed its April 2007 Chapter 11 petition and continued to manage its

remaining property as a debtor-in-possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

---

[5]Count Six pertains to Aetna and is not the subject of the dismissal motions.

[6]This Court has jurisdiction of this adversary proceeding (and may determine these motions) as having arisen in a case under Title 11 U.S. Code.  *See* 28 U.S.C. § 1334(b).  Note that the APA developed in the Chapter 11 case, and causes arising from that contract and resulting transaction are deemed to be "core."  *See*, *e.g.,* 28 U.S.C. § 157(b)(2)(A)(B) and (O).

[7]In deciding Rule 12(b)(6) motions, the Court shall accept facts pled in the First Amended Complaint as true.  Moreover, the Court shall take into account and judicially note matters established and in the record of this Chapter 11 case.

On November 9, 2007, the Court entered an order (the "Sale Order") approving the sale of the

hospital assets to IJKG pursuant to the Asset Purchase Agreement (the "APA") attached to the

Sale Order.  The sale closed (effective February 1, 2008), under circumstances known well to

this Court; cash losses throughout the Chapter 11 case were crushing, there was great difficulty

in finding a buyer, and the hospital was barely able to keep its doors open long enough to close

the sale.

   Prior to the sale, the debtor had both a Medicare provider agreement and a Medicaid

provider agreement.  Medicare reimburses service providers by periodic interim payments which

are estimates.  Subsequent annual cost reports by the providers then allow Medicare to reconcile

the actual elements of reimbursement with the estimated payments.  *See In re Univ. Med. Ctr.*,

973 F.2d at 1069-70.  The debtor was thus required by Medicare to file annual cost reports with

"CMS."[8]  These cost reports are subject to review and audit by CMS.  Based on the results of the

review and audit, CMS could determine that the debtor had been overpaid for Medicare, and

have to reimburse the government, or that the debtor had been underpaid by Medicare, such that

the debtor would receive a refund.

   Under the APA, the debtor remained liable for all amounts due and owing under cost

reports for periods prior to the closing, and retained the right to receive all refunds due for such

periods.  *See* APA §§ 2.4(i), 2.4(m), 2.4(n) and 2.4(v).  In addition, the Sale Order provided that

"[e]xcept as otherwise set forth in the APA, the transfer of Assets to [IJKG] does not and will not

---

[8]The term "CMS" shall mean and include the Centers for Medicare and Medicaid
Services; the debtor's Medicare fiscal intermediary, Riverbend Government Benefits
Administrator; the debtor's Medicaid fiscal agent, Unisys; and/or any other applicable
governmental agency or authorized agent thereof.  *Sub judice*, this Court equates "CMS" and
"Medicare."

6

subject [IJKG] to any liability whatsoever with respect to the operation of the Debtor's business and/or the ownership of the Assets prior to the Closing." Sale Order, ¶ G. Accordingly, the debtor was to be responsible for liabilities related to the cost reports for all periods prior to the closing date.

Consistent with the APA, *and by arrangement of the parties*, receivables under the debtor's Medicare provider agreement paid postclosing but related to services rendered preclosing, have been distributed to the debtor (not to IJKG) through a holding account supervised by a jointly selected intermediary. IJKG is receiving reimbursement for services rendered postclosing, and certain "transition" patient-service reimbursements are being allocated between the parties. This arrangement was implemented by orders of February 15, and March 7, 2008 (docket entry nos. 1112 and 1179 in the main case). The arrangement and orders were required to "square" the intent of the APA's established account receivable/liability dividing line, i.e, the closing date, with the Medicare mechanics of making ordinary course reimbursement[9] to the party holding the provider number without differentiation between a purported "assignor" and "assignee" of the service agreements and number. *See*, *inter alia*, hearing transcript of February 1, 2008.

A.    **Authorization to Pay 2004 Settlement**.

At this time, the only liquidated Medicare claim against the debtor is the settled cost report obligation for the prepetition year 2004. That claim, in part the subject of the debtor's

---

[9]Distinguish the so-called "Besler Settlement," where the government paid a class action settlement amount (some $677 million) to a class-action plaintiffs' designee, for redistribution to the debtor's secured creditors on behalf of the debtor as a member of the suing class.

"critical vendor" motion (heard May 15, 2007, docket entry 71 in the main case), was there

described at ¶ 13 as follows:

> In the ordinary course of its business, the Debtor receives payments
> from CMS on behalf of patients whose medical services are covered
> by Medicare and Medicaid. These payments are an essential part of
> the Debtor's revenues. Prior to the Petition Date, the Debtor and
> CMS determined and agreed that there were certain overpayments
> made by CMS to the Debtor. As a result, in order to alleviate the
> adverse impact upon the Debtor's revenue stream from an immediate
> offset of the entire agreed to overpayment amount from amounts
> otherwise due to the Debtor, the Debtor and CMS agreed to a
> monthly repayment schedule. Specifically, on October 23, 2006,
> CMS approved a repayment plan with the Debtor providing for
> reimbursement of Medicare and Medicaid overpayments made to the
> Debtor prior to the Petition Date over a period of 24 months. The
> repayment plan provides for payment of a total repayment of
> $3,488,737 over the two year period (the "CMS Repayment Plan"),
> consisting of 23 monthly payments of $156,000 beginning on
> October 28, 2006 and a final monthly payment of $147,983.46 due on
> September 28, 2008. As of the Petition Date, the outstanding balance
> owed under the CMS Repayment Plan was approximately
> $2,510,000.

The following point was promoted in the debtor's successful motion to allow payment of

prepetition claims early in the Chapter 11 case (*id.* at ¶ 21):

> In addition, the obligations relating to the overpayments arose prior
> to the Petition Date. Although funds are being paid to the Debtor by
> . . . CMS after the Petition Date, during the initial stage of this
> chapter 11 case, such funds relate to services rendered by the Debtor
> prior to the Petition Date. In other words, they are prepetition
> receivables due to the Debtor. The amount of such postpetition
> payments on account of prepetition receivables greatly exceeds the
> estimated payments to be made by . . . CMS. The Debtor anticipates
> that . . . CMS will assert that the amounts owing under the
> Repayment Agreements are secured by a right of offset under section
> 553 and 506 of the Bankruptcy Code. As noted above, any effort by
> . . . CMS to disrupt the anticipated revenue stream during this chapter
> 11 case to protect any asserted right of offset would devastate the
> Debtor's postpetition liquidity needs.

And, the debtor "[i]mportantly" budgeted the Medicare settlement payments (*id.* at ¶ 23).

Following the Court's authorizing order of May 15, 2007[10] (docket entry no. 205 in the main

case) payments were continually made throughout the case until default on the payment due

April 28, 2008 (after the closing), leaving six monthly installments unpaid.  IJKG has now

"re-settled" this obligation and is making payments for which it seeks recourse in this adversary

proceeding.

Special emphasis will be placed hereinafter on the significance of the debtor's

undertaking of the CMS settlement of 2004 postpetition, and the debtor's conduct as it relates to

the settlement.

**B.**     **Security Interest in Gross Receipts.**

The debtor entered into a Master Trust Indenture dated as of December 1, 1994, later

supplemented, obtaining financing through four series of indebtedness the outstanding balance of

which totaled in excess of $45,110,000 as of the Petition Date.  *See* docket entry no. 1573 in

main case, ¶¶ 3 and 4.  Accordingly, the Master Trustee has filed a proof of claim in this

bankruptcy case on behalf of itself and the other secured creditors in the amount of

$46,673,886.79.  This debt had been intended to be secured by, *inter alia*, a first priority lien in

the "Gross Receipts," defined in the Master Indenture as:

---

[10]This order specified that the CMS Repayment Plan was not being assumed (per § 365 of
the Bankruptcy Code) by the debtor (decretal ¶ 4); however, CMS was "authorized . . .
to . . .offset the agreed amount as and when due by the Debtor" under the plan, provided the plan
allowed such offset.  *Id*. at ¶ 2.  In fact, the plan did so allow.  *See* docket entry no. 25, Ex. A,
adversary proceeding.  This "offset," narrowed in scope to the 2004 settlement amount, was
distinguished in the order from more general (and Code-bound) § 553 setoff rights, and rights of
recoupment; such setoff and recoupment rights remained undetermined by the order.

all receipts, revenues, income and other moneys received by or on behalf of an Obligated Issuer, including, without limitation, contributions, donations and pledges whether in the form of cash, securities or other personal property, revenues derived from all facilities of an Obligated Issuer, and all rights to receive the same, whether in the form of accounts receivable, contact rights, chattel paper, instruments or other rights, and the proceeds thereof, and any insurance or condemnation proceeds thereon, whether now existing or hereafter coming into existence and whether now owned or held of hereafter acquired by an Obligated Issuer; provided, however, that Gross Receipts shall not include (i) any amounts excluded from calculations of Non-Operating Revenues, (ii) rents, profits or revenues of any nature derived exclusively from property securing Non-Recourse Indebtedness, and (iii) any Related Revenues.

*Id*. at ¶¶ 4 and 5.

Subsequent to the Petition Date, through a number of interim orders granting the debtor's motion to authorize the use cash collateral and providing adequate protection, the secured creditors were granted replacement liens, additional security interests, and other protections against the diminution of their interest in the prepetition collateral.  While the validity of the secured creditors' lien was not challenged, the Creditors Committee reserved certain rights to continue to investigate and challenge the value of the prepetition collateral as of the Petition Date, the amount of the secured creditors secured claim against the debtor's estate, and whether there had been any diminution of the value of the prepetition collateral (as ultimately asserted by the secured creditors) since the Petition Date.  *Id*. at ¶¶ 7 and 8.

On or about February 25, 2008, the Master Trustee and FSA commenced an adversary proceeding against the debtor and the Committee by filing a verified complaint (i) to determine the extent, validity and priority of liens pursuant to (a) the Master Trust Indenture and (b) various Court Orders, (ii) for turnover of collateral to the Master Trustee, and (iii) for an injunction against further expenditures by the estate pending the Court's determination as to the

10

secured creditors' liens.  The complaint raised the extraordinarily complex question of the

*diminution claim* (which, if proven, could garner a superpriority administrative expense status as

well as postpetition liens).[11]

_____

[11] Protection for the debtor's use of the Cash Collateral was granted to the secured
creditors by way of replacement liens and additional liens that encompassed essentially all of the
debtor's otherwise unencumbered assets, and, if needed, a superpriority administrative claim, as
follows:

> [A]s adequate protection of the interest of the Secured Creditors for
> the use of Cash Collateral, and to protect against any diminution in
> the value of the Secured Creditors' interest in the Collateral, to the
> extent of any such diminution, the Secured Creditors were granted,
> pursuant to sections 361 and 363 of the Bankruptcy Code *nunc pro
> tunc* to the Petition Date, valid, automatically perfected and
> enforceable replacement liens in the Debtor's post-petition Gross
> Receipts as defined in the Master Indenture (the "Replacement
> Liens"). As additional adequate protection, the Secured Creditors are
> hereby granted a valid, automatically perfected and enforceable lien,
> in (i) the Reserve [defined as the $4 million reserve in the Debtor's
> postpetition financing] up to a maximum amount of $2.5 million to
> the extent that the Secured Creditors establish there has been a
> diminution in the value of the Secured Creditors' Collateral since the
> Petition Date (the "Reserve Liens") and (ii) the Post-Petition
> Collateral as defined in the Final DIP Financing Order to the extent
> that the Secured Creditors do not otherwise have a valid, perfected
> and enforceable prepetition lien or a Replacement Lien as provided
> herein, including, but not limited to a second lien in each Obligor
> Property as defined in the Post-Petition Credit Agreement (the
> "Second Liens"). . . . Without limiting any of the rights of the Debtor
> or the [Committee], the Debtor's cash management system and the
> Budget are deemed to comply with the requirements of Sections 6.1
> and 6.2 of the Master Indenture. To the extent that the Secured
> Creditors establish that the adequate protection granted to the
> Secured Creditors in the Interim Cash Collateral Orders was
> inadequate, the Secured Creditors are hereby granted a super-priority
> administrative claim pursuant to Bankruptcy Code § 507(b), to the
> extent of such inadequacy.

*See*, *e.g.*, Twelfth Interim Cash Collateral Order at ¶ 4, pp. 11-12 [Main Case Doc. No. 1055].

That adversary proceeding  (docket no. 08-1182), was held in abeyance to enable the parties to resolve the issues and claims raised therein.  *Id*. at ¶¶ 9 and 10.

Following lengthy negotiations among the debtor, secured creditors and the Committee, the parties reached a settlement agreement approved by the Court on September 23, 2008, over IJKG's objection.  The order approving that settlement is now on appeal by IJKG.  The settlement was intended to pave the way for an orderly liquidation of the debtor's estate pursuant to a Chapter 11 plan of liquidation which the debtor and the Committee expected to file in the near future.  It was also intended to guaranty a minimum distribution to unsecured creditors while allowing the secured creditors prompt access to their collateral without the time, expense and risks of protracted litigation over the amount of their secured claims.  *Id*. at ¶¶ 11 and 12. Overall, the settlement:

---

The "Post-Petition Collateral" on which the secured creditors have been granted the Second Lien as adequate protection encompasses essentially all of the debtor's unencumbered assets, including:

> all presently owned or hereafter acquired property and assets of the Debtor, of any kind or nature, whether real or personal, tangible or intangible, wherever located, now owned or hereafter acquired or arising and all proceeds, products, rents and profits thereof, including, without limitation, the real property listed on Schedule 4.9 to the Post-Petition Credit Agreement, all cash, goods, accounts receivable, inventory, cash-in-advance deposits, real property, machinery, equipment, vehicles, trademarks, trade names, licenses, causes of action (except as set forth below [certain avoidance actions]), rights to payment including tax refund claims, insurance proceeds and tort claims and the proceeds, products, rents and profits of all of the foregoing . . . (the "Post-Petition Collateral").

Final Order Authorizing Debtor in Possession to Enter into Post-Petition Credit Agreement and Obtain Post-Petition Financing Pursuant to Sections 363 and 364 of the Bankruptcy Code and Granting Liens, Security Interests and Superpriority Claims.  [Main Case Doc. No. 1058.]

12

(i) allocated certain assets to the secured creditors ($10 million of postpetition preclosing patient receivables, "Other Receivables" deemed not patient related and developed prepetition, prepetition preclosing patient receivables, "Besler" recoveries on account of Medicare Disproportionate Share adjustment claims, all cost report recoveries for prepetition periods and a portion of such recoveries thereafter, etc.);

(ii) allocated certain assets to the debtor's estate (postpetition preclosing patient receivables other than those allocated to the secured creditors, Bankruptcy Code Chapter 5 claims, D&O claims, and other specific categories of claims); and

(iii) established a protocol for "treatment of claims."

The treatment of claims portion of the settlement directed prompt payment of the $10 million postpetition preclosing patient receivable fund to the secured creditors, did the same for prepetition preclosing patient collections on hand, directed turnover of that category of accounts to the secured creditors, defined the secured creditors' general unsecured deficiency claim in formula terms, and then established three phased distributions which, *inter alia*, initially subordinate the secured creditors' deficiency claims. *Importantly*, before any unsecured claims are to be paid (including those for deficiency asserted by the secured creditors), allowed administrative claims "shall be paid in full by the estate."

IJKG objected to the settlement "for the simple reason that it provides for the payment of funds held by the Debtor that are subject to imposition of a constructive trust in favor of IJKG."

13

Docket entry no. 1600, main case.  This Court's refusal to accede to IJKG's prospective

"imposition of a constructive trust," and the Court's entry of the September 23, 2008 Order

Approving Settlement, have generated IJKG's appeal.

C.      <u>**Court Approval of Assignment of Medicare Provider Number**</u>.

In plain terms, the APA "Covenants" Article VIII addressed the Medicare/and Medicaid

provider numbers, as follows:

> 8.14 Application for New Medicare and Medicaid Provider Agreements.
>
> Purchaser shall not be assigned and shall not assume any obligation under Seller's Medicare and Medicaid provider agreements. Promptly after the issuance of the Sale Order, Purchaser shall apply to CMS and DMAHS for new Medicare and Medicaid provider agreements and provider numbers for the Hospital and shall diligently prosecute such applications. Seller shall cooperate with Purchaser in prosecuting such applications; provided however that Seller shall not be required to expend any funds in enabling Purchaser to acquire new provider agreements and provider numbers. Purchaser and Seller shall report to each other frequently on their progress in prosecuting such applications and any communications with CMS, DMAHS or any other Governmental Body in connection therewith. In prosecuting such applications, neither Seller nor Purchaser shall be obligated to make any commitments to cure or provide security for any overpayments received by Seller or any violations of applicable law or regulations by Seller.

Not literally consonant with the above covenant, as a "Condition[] Precedent to Obligations of

Purchaser," APA Article X (§ 10.1(o)) includes as a predicate to IJKG's obligation to close the

obtaining of its own provider number *or the following*:

> (y) Seller and Purchaser shall have entered into a written agreement, acceptable to Purchaser, with DHHS, DMAHS and the United States Department of Justice *releasing Purchaser from liability for any overpayments received by or charged against Seller with respect to claims for services provided by Seller prior to the Closing Date*, and Purchaser shall have received all approvals necessary to assume Seller's Medicare and Medicaid provider agreements and provider

14

> numbers as of the Closing Date with Purchaser to make its best
> efforts in working with Seller in order to accomplish such
> assumption; . . . . [Emphasis added.]

In fact, IJKG did not get its own provider number, but rather by January 2008 and as time and

cash were running out for the debtor, *IJKG* chose to make a deal with Medicare and *assume* the

debtor's provider agreement and provider number.  However, that deal did *not* embody the broad

releases of preclosing liability as posited in § 10.1(o)(y) of the APA; instead IJKG left itself

generally exposed to preclosing Medicare claims, *settling and undertaking* one specified

preclosing liability.  That was known as the government's "outlier" claim.

The assumption and assignment of the Medicare agreement and number, in conjunction

with the settlement (and IJKG undertaking) of the outlier claim, were approved by this Court's

Order of February 6, 2008 (docket entry no. 1076 in the main case).  Incorporated in this order

are "statements and reservations" made by counsel at hearings, including the hearing of January

30, 2008.  At that hearing, it was evident that IJKG was, by Medicare's reckoning, exposed to

preclosing Medicare claims, notwithstanding the APA terms, and that no release was

forthcoming.  Indeed, the IJKG complaint (¶ 41) acknowledges this exposure as follows:

> IJKG has previously acknowledged that, pursuant to applicable
> Medicare or other law and by virtue of IJKG's assumption of
> Debtor's Medicare Provider Agreement, CMS may seek to hold IJKG
> liable for Debtor's Medicare liabilities that arise from periods prior
> to the Closing Date, including, but not limited to, Debtor's liability
> under the CMS 2004 Payment Plan, and Debtor's other Cost Report
> Liabilities for 2002 through 2006 and the Terminating Cost Report.

15

> However, under the APA as between Debtor and IJKG, it is Debtor
> that is liable for these pre-Closing Liabilities.[12]

Notably absent from both the debtor's motion to approve the assumption and assignment of the provider agreement (docket entry no. 1013) and the resulting order of February 6, 2008, was any reference to 11 U.S.C. § 365.  In particular, no cure obligation per § 365(b)(1)(A) was undertaken by the debtor in order to effect the assumption and assignment nor was any to be required by Medicare or IJKG; the debtor's premise was as follows (Motion ¶ 19):

> The Debtor has been advised that because this is a settlement under its existing Provider Agreement and relates to amounts owed by the Debtor for pre-petition Medicare overpayments, it needs to be a party to the CMS Settlement Agreement to facilitate the assignment of the Provider Agreement and provider number to the Buyer. *In essence, the Debtor is a conduit to facilitate the transfer even though the Buyer ultimately pays the direct repayment obligations under the CMS Settlement Agreement.* It is the Debtor's expectation that the Settlement Agreement will not require a direct cash payment by the Debtor's estate on account of the pre-petition overpayments by CMS to the Debtor. [Emphasis added.]

IJKG's response to the motion to settle, assume and assign, docket entry no.1047, clarified that it was both settling and undertaking *only* the outlier claims of CMS against the debtor.  It, too, avoided any reference to § 365 "cure," and acknowledged at ¶ 16 its exposure to the potential of preclosing cost report liabilities as follows (including an "im-parseable" second sentence):

> Presently there are a number of issues which must be resolved in order to reach acceptable Outlier Settlement Agreements. Among

---

[12]CMS had objected "to any attempt by the Debtor to sell or transfer its Medicare Provider Agreement 'free and clear' of any successor liability for Medicare overpayments." October 23, 2007 letter/memorandum from U.S.D.J., docket entry no. 762 in main case (first paragraph).  The CMS objection articulated in fullest form the legislative, regulatory and case law footings for this position.

16

such unresolved issues, without limitation, is that even though the Purchaser recognizes that by assuming the Debtor's Medicare Provider Agreement it may expose itself to other unknown potential liabilities of the Debtor thereunder, the Purchaser will not enter or consent to any agreement with the DOJ which limits or forecloses any of the pre petition and post petition liabilities and obligations under the Debtor's Medicare Provider Agreement and provider number (including any overpayments) which the Debtor and its estate would not otherwise be released from under applicable law (and would still remain liable for) after the assignment of that Provider Agreement, except for those specifically assumed under the Settlement Agreement and those arising in the normal course of reconciling and settling any outstanding cost reports. In light of the fact that the APA clearly does not require the Purchaser to assume any of the Debtor's liabilities and obligations to CMS or under its Medicare Provider Agreement, and the Purchaser is only considering exposing itself to same by assuming Debtor's Medicare Provider Agreement (pursuant to acceptable Outlier Settlement Agreements) in order to avoid a delay of the Closing, there is absolutely no reason why the Debtor should be "let off the hook" for these liabilities even though the Purchaser may have "gotten on the hook" because it assumed that Provider Agreement. Although the Purchaser is not seeking to impose any liability on any person or party that they are not already exposed to, the Purchaser will not, under any circumstances, agree to indemnify any person or party, including the Debtor, its officers, directors/trustees, employees, agents or representatives, or the Debtor's estate, successors or assigns . . . for any of the Debtor's pre-Petition or post-Petition liabilities to CMS or under the Debtor's Medicare provider agreement and provider number.

The secured parties weighed in by objecting to the settlement, assumption and assignment (docket entry no. 1048), emphasizing their interest in Gross Receipts, IJKG's APA obligation to obtain its own provider agreement and number, and both the absence of reference to § 365 in the motion and failure to meet the requirements of that section.

The motion and responses were vetted at hearings, culminating in the hearing of January 30, 2008. *See* transcript, docket entry no. 1285 in main case ("1/30/08 Tr. __"). Faced with the pressure of the impending closing, the parties agreed (i) that there was to be an assumption and

17

assignment[13] of the Medicare provider agreement so as to facilitate IJKG's operation of the

hospital, (ii) that the outlier liability was to be settled (ultimately undertaken in a settled amount

by IJKG), and (iii) that all parties-in-interest "reserve[d] their rights with respect to any

government claims that might be made with respect to Medicare liability other than outlier. . . ."

1/30/08 Tr. 21:13-15.  S*ee also, id.* Tr. 22:18-20.

Ultimately, the Court's implementing order of February 6, 2008 (docket entry no. 1076),

provided in pertinent part the following:

> 2.    The findings of the Court and the statements and reservations
> made by counsel as set forth on the record at the Hearings are
> incorporated in this Order.

> 3.    Pursuant to the Asset Purchase Agreement, entry of this
> Order shall not impair the ability of the Debtor or, to the
> extent authorized by the Court, the Master Trustee, to bill,
> collect and recover any Gross Receipts and Transition Patient
> Services arising from services provided and charges incurred
> prior to the Closing.   Pursuant to the Asset Purchase
> Agreement, entry of this Order shall not impair the ability of
> the Buyer to recover revenues arising from services provided
> and charges incurred after the Closing.

**D.    The Besler Settlement**.

IJKG isolates, emphasizes and seeks relief based upon a class action settlement payment

to the debtor, emanating from Medicare and allegedly received by the debtor postclosing.  *Inter*

*alia,* this is part of the plaintiffs' more general theory for alternative relief, i.e., if IJKG is

saddled with preclosing liabilities for cost reports, it is entitled to "all proceeds related to

Debtor's Medicare Provider Agreement received by Debtor post-closing."  Complaint

---

[13]The record is replete with distinctions between the assumption and assignment *sub judice* and that which would occur per § 365.  *See* 1/30/08 Tr. 7:2-8; 8:19-23; 9:10-17; 10:1-14; 11:1-23.

18

"Wherefore" provisions, Count One (c), Count Two (c), Count Three (c), and Count Four (c); *see* Count Five "Wherefore" provisions (b) and (d).

As matters were fulminating in the crush of late January 2008 events, Besler settlement issues were being resolved by this Court's January 25, 2008 Stipulation and Order (docket entry no. 1032, main case). The long history (back to 1998) of the debtor's engagement of Besler Consulting is there described. Its role was to assist the hospital in identifying and pursuing "Medicare Disproportionate Share Adjustment claims" and other claims. Those claims became part of the "Baystate Litigation," a class action including the debtor as a plaintiff in a group organized by Besler. As of January 25, 2008, a $677 million settlement had been negotiated with the government, with the debtor's share said to be $1,358,063 (subject to Besler's contingent fee). The subject Court order authorized both the settlement and the fee arrangement. Moreover, any Besler recoveries (from the Baystate Litigation or otherwise) were deemed to be collateral of the secured creditors. Such collected funds, i.e., once released and paid by the government, were ordered to be turned over directly to the Master Trustee, and if they were to come into the possession of the debtor, the debtor was to turn them over to the Master Trustee. Notice and objection periods were allowed. *Id.* at ¶ 2.

The Besler recovery was, in fact, referenced by IJKG in its response to the debtor's motion to settle outlier and authorize the assumption and assignment of the provider agreement. *See* docket entry no. 1047 in main case. Though again not a model of clarity, IJKG at ¶ 17 argued as follows:

> Subsequent to the Purchaser's commencement of discussions with the CMS and the DOJ regarding the Outlier Payments, the Purchaser has become aware that the Debtor has recently reached a settlement with CMS (and/or other governmental entities), known as the "Besler

19

Consulting Settlement" by which the Debtor is entitled to receive, or may have already received substantial sums. These settlement funds arise from the Debtor's pre-Petition relationship with CMS, just as the Debtor's liability for the Outlier Payments also arise from the Debtor's pre-Petition relationship with CMS. Under the Debtor's Medicare Provider Agreement, the Besler Consulting Settlement funds could offset/reduce any liabilities for Outlier Payments under that agreement. The DOJ has the right to offset the Besler Consulting Settlement against the amounts due from the Debtor regarding the Outlier Payments and which would be assumed by the Purchaser under acceptable Outlier Settlement Agreements, thereby reducing the amount required to be paid by the Purchaser on account of what are really the Debtor's liabilities. In addition, there are also potential unknown pre-Petition and post-Petition liabilities of the Debtor which Purchaser may become exposed to merely by assuming the Debtor's Medicare Provider Agreement which liabilities the Purchaser would not be exposed to if it obtains its own new Medicare provider agreement. However, it appears that the Debtor seeks to retain such funds while the Purchaser, should it assume the Debtor's Medicare Provider Agreement, becomes exposed to the Debtor's liabilities thereunder instead of simply allowing those funds to reduce the amount to be paid to the DOJ on account of the Outlier Payments, or any other presently unknown liabilities Debtor may have against which such funds could be offset. Accordingly, the Purchaser requests that until (i) Outlier Settlement Agreements acceptable to the Purchaser and executed by all parties are approved by this Court, and (ii) all amounts are reduced to final amounts and any applicable offsets made, or the DOJ releases Debtor and the Purchaser from any claim or cause of action to recover funds received by Debtor in connection with the Besler Consulting Settlement or otherwise, any funds received by the Debtor on account of the Besler Consulting Settlement be held in escrow and not disbursed for the Debtor's unfettered use. And, to the extent that Purchaser may have liability for any set off under any contemplated assignment of the Debtor's Medicare Provider Agreement, the Purchaser should be the beneficiary of the Besler Consulting Settlement and reserves all rights with respect thereto.

Indeed, that same response of January 27, 2008 provided a "Wherefore" request for an "order that any funds already or hereafter received by the Debtor from the Besler Consulting Settlement be held in escrow pending further order of this Court with all parties, including the Purchaser,

reserving all rights with respect to same. . . ." However, no request was made for such an escrow

at the critical January 30, 2008 hearing, none was discussed or even alluded to, none was

contemplated as being part of any implementing order, and none was included in the February 6,

2008 implementing order. In April 2008, an apportioned amount of more than a million dollars

was released, through the Baystate Litigation counsel, directly to the Master Trustee.

E.      **IJKG's Effort to Enjoin CMS Charge Backs.**

During the pendency of this adversary proceeding, IJKG moved (docket entry no. 25) to

extend the automatic stay enjoyed by the debtor, to cover IJKG so as to enjoin Medicare from

seeking recourse against IJKG-generated receivables for Medicare's preclosing claims (and, of

course, particularly the 2004 cost report settlement amount embodied in the October 23, 2006

repayment plan). However, IJKG did not see fit to make Medicare a *party to the adversary*

*proceeding*, and, after a number of adjournments, appears to have withdrawn its motion. In fact,

IJKG has settled the 2004 cost report claim with the government.[14]

---

[14]In so doing, IJKG appears to have abandoned the following wrongly conceived point
made in its motion (¶ 59):

> *University Medical Center* controls here. Just as in that case, the
> Government seeks to recoup pre-petition overpayments from a prior
> cost year against amounts due in the current cost year. Just as in
> *University Medical Center*, however, these are not part of the same
> transaction, and recoupment is not appropriate. Since the CMS 2004
> Payment Plan speaks only of the right to recoup (not set off), the
> Government should not be allowed to set off IJKG's 2008 cost year
> revenues against the 2004 cost year liabilities.

The October 23, 2006 plan is not limited to *recoupment* (as distinguished from *setoff*). The clear
conceptual basis for the plan is that the year 2004 cost report debt would, through the October
23, 2006 plan, be satisfied in the event of default in plan payments, out of subsequent hospital
claim amounts, i.e., setoff. In context, the plan provides:

III.    **Determination.**

A.    **Twombly Standard and Record for Determination of Motions.**

The debtor, FSA, and the Master Trustee have moved under FED. R. CIV. P. 12(b)(6) to

dismiss the complaint for "failure to state a claim upon which relief can be granted."  FED. R.

CIV. P. 12(b)(6) is incorporated into FED. R. BANKR. P. 7012(b).  To withstand a motion to

dismiss under R.12(b)(6) the plaintiff must plead facts which, taken as true, form a plausible

basis for recovery.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007).  The Third

Circuit, in implementing *Twombly*, concluded as follows:

> The Supreme Court's *Twombly* formulation of the pleading standard
> can be summed up thus: "stating . . . a claim requires a complaint
> with enough factual matter (taken as true) to suggest" the required
> element . . . .  This "does not impose a probability requirement at the
> pleading stage," but instead "simply calls for enough facts to raise a
> reasonable expectation that discovery will reveal evidence of" the
> necessary element. . . .

*Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008), citing *Twombly*, 127 S.Ct. at

1965.  *See Asahi Glass Co. v. Pentech Pharms., Inc.,* 289 F. Supp. 2d 986, 995 (N.D. Ill. 2003)

("[S]ome threshold of plausibility must be crossed at the outset before [a case] should be

permitted to go into its inevitably costly and protracted discovery phase"), *quoted* in *Twombly* at

127 S.Ct. at 1966.  This precept is particularly apt in bankruptcy cases generally, and in this

---

> If two consecutive payments are missed, your account will be
> considered in default.  At such time, we will begin withholding 100%
> of your claims until the defaulted payments are recouped.  If your
> account goes into default a second time during the ERP, you will be
> removed from the ERP and we will withhold 100% of your claims
> until the balance of your account is recouped.

The term "recouped," above, was plainly used in its generic, dictionary sense, i.e., "recovered."

22

immediate circumstance, where both the debtor and IJKG are struggling (one in the aftermath of a community hospital's failure and the other in trying to resuscitate that hospital).

As a general rule, "a . . . court ruling on a motion to dismiss may not consider matters extraneous to the pleadings.  However, an exception to the general rule is that a 'document integral to or explicitly relied upon in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.'" *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (citation and emphasis omitted).  "[D]ocuments whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleadings, may be considered. * * * Documents that the defendant attaches to the motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the claim; as such they may be considered by the court." *Hopkins v. First NLC Fin. Servs., LLC (In re Hopkins)*, 372 B.R. 734, 740 n.2 (Bankr. E.D. Pa. 2007) (quoting *Pryor v. NCAA*, 288 F.3d 548, 560 (3d Cir. 2002)); *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1996-97 (3d Cir. 1993).

Additionally, in considering a motion to dismiss, courts may consider matters of public record that display a significant relationship to the complaint, orders or items included in the case's docket, and matters subject to judicial notice.  *Pryor v. NCAA*, 288 F.3d at 559-60; *Steinhardt Group Inc. v. Citicorp.*, 126 F. 3d 144, 145 (3d Cir. 1997).  A court may take notice, not only of public records, but also of judicial proceedings.  *Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group, Ltd.*, 181 F.3d 410, 426-27 (3d Cir. 1999).

In the immediate complaint, IJKG references the APA and this Court's Order of February 6, 2008.  These documents were not attached as exhibits to the complaint.  Nonetheless, because

23

IJKG references these items and premises the cause of action on these documents, the Court

should consider these documents in their entirety in deciding the Motion.  More broadly, given

the full and undisputed record of this Chapter 11 case and this Court's intimate familiarity with

the record, the Court will consider that record, including, for example, its orders, the transcript of

the January 30, 2008 hearing, and the April 2007 application to pay Medicare the 2004

settlement amount as a reasonable and necessary expense.

      **B.**      **Plaintiffs' Count One Breach of Contract Claims**.

      1.      <u>The IJKG Covenant To Obtain a New Provider Agreement and Number</u>.

IJKG blithely ignores its APA § 8.14 covenant to "[p]romptly . . . apply to CMS . . .for

[a] new Medicare . . . provider agreement[] and provider number[] . . . and . . diligently prosecute

such application[s]."  This covenant is premised on the APA fundamental: "*Purchaser shall not

be assigned and shall not assume any obligation under Seller's Medicare . . . provider

agreement*[]."  *Ibid.* (emphasis added).  The same section commits the debtor to cooperate with

IJKG's application efforts, but not to expend enabling funds.  This determinative contract clause

concludes as follows:

> In prosecuting such applications, neither Seller nor Purchaser shall be
> obligated to make any commitments to cure or provide security for
> any overpayments received by Seller or any violations of applicable
> law or regulations by Seller.

Against this covenant, as if to nullify it, IJKG mistakenly relies on language in the

"Conditions Precedent" article of the APA.  Clearly, § 10.1(o) protected IJKG against a *forced

closing* unless the business lifeline Medicare provider agreement and number were in place.  As

an option, however, it was conceived that IJKG could close, having entered into an agreement

with Medicare "*releasing Purchaser from liability for any overpayments received by or charged*

24

*against Seller with respect to claims for services provided by Seller prior to the Closing Date*, and . . . [having received] . . . approvals necessary to assume Seller's Medicare and Medicaid provider agreements and provider numbers as of the Closing Date with Purchaser to make its best efforts in working with Seller in order to accomplish such assumption; . . . ." [Emphasis added.]

As matters stood on January 30, 2008, IJKG had *not* obtained its own number and apparently could not prevail on Medicare and DOJ to issue the broad release it would need to immunize itself from the preclosing cost report jeopardy.[15]  And, that jeopardy was well known to IJKG (*see, e.g., In re University Medical Center*), having been thoroughly articulated by Medicare in its October 23, 2007 objection to the sale motion.  In the final analysis, it was IJKG which (i) failed to honor its covenant to obtain a new agreement and number, and (ii) failed to develop a substitute agreement which would have satisfied the plainest intent of the APA: that is, to have the closing date serve as a dividing line, with refund rights and overpayment liabilities to reside with the actual servicer (old hospital before the closing and IJKG afterward).

---

[15]Since the debtor also had to agree to such an arrangement, the Court is confident that any such wished-for contract would have provided that preclosing service-based refunds would be preserved for the benefit of the estate.  *See* APA § 2.2(c): "Excluded Assets," i.e., those not to be transferred to IJKG, include:

> any rights to refunds, settlements and retroactive adjustments to the extent applicable to periods ending on or before the Closing Date arising in connection with the Hospital Medicare and Medicaid provider numbers and related participation agreements or any other third-party healthcare payor program of the Hospital;. . . .

The *University Medical* case held fast to the petition date dividing line (thus limiting Medicare *setoff* rights per § 553 of the Bankruptcy Code),[16] *and* emphasized that recoupment rights[17] of Medicare (which are *not* § 553 bound) were limited to *single year* adjustments (i.e., a "due to" Medicare in a particular service year could be recouped from a "due from" Medicare in that year, but *not* for a different year; *setoff* would apply across the service year boundaries, subject to § 553). 973 F.2d at 1079-82. *See* footnote 2 *supra* for contra authority. It is further emphasized that Medicare's position before this Court (*not* the subject of any ruling by this Court) has been that assumption and assignment of the service agreement and number by IJKG (per Medicare law and regulations and independent of 11 U.S.C. § 365) removes all time dividing line impediments to recoupment/setoff which applied to Medicare under the *University Medical* case. *See* 973 F.2d at 1075-79 (discussion of *absence* of assumption of provider agreement by debtor per § 365). *If* such were ultimately found to be the case, any number of still unknown "due to"/"due from" variations could wreak havoc on the APA's neat plan. The debtor, e.g., could lose a "due to" it because of an IJKG "due from," or a prepetition "due from" the debtor (standing alone, a general unsecured claim) could be offset against a postpetition preclosing due to the debtor (contrary to § 553). Conversely, by way of illustration and

---

[16]With exceptions per §§ 362 and 363 not here relevant, the Code "does not affect any right of a creditor to offset a mutual debt owing by such creditor to a debtor that arose *before commencement of the case* . . . against a claim of such creditor against the debtor that arose *before the commencement of the case*," with further exceptions for preferential improvement in position by the creditor. 11 U.S.C. § 553(a). [Emphasis added.]

[17]Recoupment rights benefitting a party to a transaction arise out of the same transaction which generated the "due from" that party. Of course, defining "same transaction" is key to such rights. The more general setoff right involves interaction of credits between parties other than arising out of a single transaction. *See generally*, *University Medical*, 973 F.2d at 1079.

26

assuming Medicare's position was sustained, a "due to" IJKG could be recouped/setoff against

by Medicare for a prepetition "due from" the debtor – elevating the Medicare position from that

of a general unsecured creditor of the debtor (sure to be paid only cents on the dollar of claim),

to that of a dollar-for-dollar payee out of funds due IJKG.[18] This, of course, is IJKG's worst

nightmare and some of the impetus to this adversary proceeding.  These illustrations give but a

glimpse of turmoil which IJKG's failure to obtain its own Medicare provider number might

foment.

IJKG chose to blur the contracted-for dividing line.  Therefore, if there is an ultimate cost

which cannot be lawfully and equitably adjusted so as to comport with the contractually intended

result, *it must be borne by IJKG as the party who failed to meet the preconditions established by

the APA.*

2.   <u>Context and Equitable Considerations</u>.

Between the November 9, 2007 APA approval and the end of January 2008, the debtor's

finances continued to deteriorate.  The Bayonne community was going to lose its hospital.

IJKG, having made a business deal (as a for-profit entity), and apparently having underestimated

the time needed to complete the process of obtaining its own provider number, had to decide

whether to let the hospital crash or take on preclosing jeopardy *not* required by the APA.  On the

---

[18]To be clear, the debtor has offered IJKG a *general unsecured claim*, at least for the prepetition claim of Medicare for the 2004 settlement which IJKG has taken on.  IJKG seeks, among other remedies, an administrative claim for its trouble (i.e., ostensibly dollar-for-dollar payment).  Similarly, IJKG requests such payment in full (since administrative expense funding is said to be 100 percent available at least as projected) for *all preclosing* cost report obligations of the debtor for which IJKG is exposed.  Yet, if IJKG had met its contractual obligation and gotten its own Medicare number, *only postpetition preclosing* cost report obligations of the debtor (if any) would garner such priority claim status.

one hand, it was getting a fully equipped and staffed facility at a price which was comparable to

liquidation value; on the other hand, the operating losses had to be turned around (in a stingy

marketplace), and now Medicare jeopardy (made up of outlier and cost report preclosing claims

and potential claims), was staring IJKG in the face.  This Court was pressing for a closing.

Serious public interests were at stake.  No other buyer was in a better position to close than

IJKG.  It was in this context that IJKG volunteered to take a risk, of course serving its own

interest, but also coming to the aid of a vital public need.  It stood as a buyer when others were

too timid to bid.  Given this history, IJKG calls for consideration by this Court, even though

IJKG made its business decision – plainly waiving its release and/or "new number" immunity.

Seeking "equity," IJKG complains about its quandary, exacerbated by the debtor's default as of

April 28, 2008 on the settlement of the 2004 cost report liability.[19]

Given the context of this asset sale and a certain amount of concern for IJKG's position,

this Court has held itself available to parties-in-interest to adjust matters between the debtor and

IJKG, consistent with the Bankruptcy Code, applicable law, and the rights of other

parties-in-interest.  The Court remains so available.  Indeed, the Court is mindful of IJKG's

tenuous position in operating a hospital in Bayonne.  Perhaps much of the "benefits of the

bargain" struck in the APA[20] can be preserved (at least to the extent feasible both substantively

---

[19]At the "crunch time" of January 30, 2008, imprecision reigned; all hoped that
"whistling past the graveyard" would work.  To some extent the "reservation of rights" language
of the February 6, 2008 implementing order as drafted or approved by parties-in-interest allowed
them the momentary comfort needed to close the sale.  At this time, however, *refunds* as well as
*liabilities* attributable to preclosing services are at risk of being directed by Medicare contrary to
both the APA and this Court's orders.

[20]Hypothetically, and as if IJKG had obtained per the APA its own Medicare provider
agreement and provider number as of the asset sale closing, how would the parties-in-interest

and procedurally and if properly initiated by the parties).  The Court will not initiate such a

process, particularly without having an indication of the parties' willingness to have the Court so

engaged, *and* to incorporate Medicare into any such initiative.  *See* footnote 33, *infra.*

     3.     Years 2002-2008 (through 1/31/08, excluding 2004).

     In light of IJKG's failure to satisfy its § 8.14 covenant,[21] it simply cannot assert a

plausible claim for the debtor's breach of contract based upon those potential and as of yet

unliquidated cost report liabilities (apparently for years running from 2002 to the January 31,

2008 closing, but excluding 2004). Indeed, this all-too-obvious point undercuts much of the

complaint, rendering substantial portions plainly implausible.  Put in terms of the debtor's

contractual obligations under the APA, and apart from contentions regarding the CMS 2004

settlement agreement, there is no conduct of the debtor which is addressed in the complaint as

being a breach of any of the debtor's undertakings; it was IJKG which dramatically changed the

regulatory landscape in the postcontract preclosing period.  It is IJKG which should bear the

resulting burdens, subject to certain possible equities addressed immediately hereinafter.

Accordingly, any such Count One claim and all remedies *for breach of contract* related to cost

report liabilities for those stated periods shall be dismissed.  *See, generally*, *Video Pipeline, Inc.*

*v. Buena Vista Home Entm't, Inc.,* 275 F. Supp. 2d 543, 566 (D.N.J. 2003).

---

have been positioned relative to Medicare cost report refunds and charges accruing preclosing?
The answer lies largely in analyses of such variables as Medicare claim priorities (administrative
or general unsecured), setoff and recoupment rights of Medicare, and the interaction of Medicare
claims with the rights of secured creditors.

    [21]In particular, the complaint's ¶ 77 ("IJKG has fully performed the contract") is
unfounded and wrong.

4.    <u>CMS 2004 Repayment Plan</u>.

There are significant differences between the purported breach of the APA by the debtor based upon unliquidated cost report jeopardy, and the purported breach of the APA occasioned by default in the CMS settlement undertaking of the debtor.  Even at the time of IJKG's "eyes wide-open" assumption of the debtor's Medicare provider number and agreement, it is *plausible* that IJKG believed, reasonably and actually, that settlement payment (for 2004 cost report liability) would continue to be made by the debtor.  Moreover, it is *plausible* that the debtor intended same – even after the change in process that IJKG initiated.  And, indeed, such understandings would not be inconsistent with the APA.  Hence at this stage of the case, the movants have failed to satisfy the *Twombly* standard for dismissal of Count One in the following respect: a plausible case for breach of contract has been pled as to the liability (said to be $248,000) which IJKG is apparently now paying (per a revised installment schedule).

For such a breach, the liquidated nature of the claim would call for a conventional damage remedy.  Damages arising solely from the 2004 settlement, if ultimately awarded, would likely be an administrative expense under § 503 of the Bankruptcy Code (breach of a postpetition contract under these circumstances), though it is too early to decide this issue. Administration funds are said to be available, and as is customary would be distributed so as to account for all administrative claims once the allowance process (including this litigation) is concluded.

5.    <u>Summary - Count One Dismissal</u>.

In sum, the claims of breach of contract are to be dismissed as implausible, with three exceptions.  Those exceptions are: the liquidated year 2004 cost report settlement amount undertaken by IJKG postclosing; the transition service "Smart Solutions"/Armanti claims; and the employee-based claims.  (As to the last two exceptions, *see* footnote 3, *supra*.)

In terms of remedy, no "escrow" is necessary or appropriate to fund any potential judgment for the remaining aspects of Count One.  Nor is there a need to distort the intent of the APA by requiring a turnover of postclosing proceeds of the debtor's Medicare services or the Besler settlement (all occasioned by preclosing events).[22]

**C.    <u>Plaintiff's Count Two Breach of Duty of Good Faith and Fair Dealing</u>.**

Much like Count One, and with the three exceptions noted in Point III B(5) above, claims of breach of duty here are not plausible and shall be dismissed.  (Excluded remedy requests also parallel the Count One determination.)

In its essence, a breach of the duty of good faith and fair dealing of contracting parties requires the complaining party to show bad faith or bad motive in the adverse party.  "[E]very contract in New Jersey contains an implied covenant of good faith and fair dealing."  *Sons of*

---

[22]To the extent that the complaint seeks an escrow or turnover of  "gross receipts" already received by the debtor or the secured creditors (including the Besler settlement amount), it seeks a remedy which runs counter to this Court's cash collateral orders and the Besler Settlement Order of January 25, 2008.  *See* 11 U.S.C. §§ 361 and 363(a).  There is no basis in law under the circumstances of this case to allow IJKG to "trump" the pre-APA secured position of those creditors in *received* gross receipts of the debtor.  Most particularly, the APA clearly excludes from assets purchased by IJKG "gross receipts" due the secured parties, which include all Medicare accruals preclosing.  *See* APA §§ 1.1, 2.2(a) and 2.9.  As to IJKG's asserted right to the setoff and recoupment rights of Medicare (against future amounts due the debtor from Medicare) by way of equitable subrogation, *see* Point III E, *infra*.

*Thunder, Inc. v. Borden, Inc.*, 148 N.J. 396, 420 (N.J. 1997). "In determining under contract law, what covenants are implied, the object which the parties had in view and intended to be accomplished, is of primary importance. . . . It is of course not the province of the court to make a new contract or to supply any material stipulations or conditions which contravene the agreements of the parties." *Onderdonk v. Presbyterian Homes of N.J.*, 85 N.J. 171, 183 (1981). To prove breach of good faith requires evidence of bad faith or bad motive in the way that a party exercised its discretion under the contract. *Wilson v. Amerada Hess Corp.*, 168 N.J. 236, 251 (2001). The court in *Wilson* stated the standard as follows:

> [A] party exercising its rights to use discretion . . . under a contract breaches the duty of good faith and fair dealing if that party exercises its discretionary authority arbitrarily, unreasonably, or capriciously, with the objective of preventing the other party from receiving its reasonably expected fruits under the contract. Such risks clearly would be beyond the expectations of the parties at the formation of a contract when parties reasonably intend their business relationship to be mutually beneficial. They do not reasonably intend that one party would use the powers bestowed on it to destroy unilaterally the other's expectations without legitimate purpose.

*Wilson*, 168 N.J. at 251. The court further observed: "[D]iscretionary decisions that happen to result in economic disadvantage to the other party are of no legal significance." *Wilson*, 168 N.J. at 251. *Sub judice*, it was the exercise of discretion by IJKG (*not the debtor*) that has jeopardized IJKG. Such a self-inflicted injury is not contemplated by the implied covenant. Hence, Count Two must be dismissed as implausible to the same degree as Count One.[23]

---

[23]Given that a plausible contention persists with respect to the debtor's undertaking of the 2004 settlement and payment of the CMS settlement installments pre- and post-closing (through April 2008), this count will not be dismissed to that limited extent. *See also*, footnote 3, *supra*.

**D.    Count Three Claim of Promissory Estoppel; Count Four Claim of Unjust Enrichment.**

IJKG's equitable claims of promissory estoppel, as to the debtor, fail to pass the plausibility test to the same degree as do Counts One and Two.  To make a claim for promissory estoppel the plaintiff must plead facts to establish: "(1) a clear and definite promise; (2) made with the expectation that the promisee will rely upon it; (3) reasonable reliance upon the promise; (4) which results in definite and substantial detriment."  *Commerce Bancorp., Inc. v. BK Int'l Ins. Brokers, Ltd.,* 490 F. Supp. 2d 556, 561 (D.N.J. 2007), quoting *Lobiondo v. O'Callaghan*, 357 N.J. Super. 488, 499 (App. Div. 2003) *certif. denied*, 177 N.J. 244 (2003). "Quasi-contracts may be found only in the absence of any expression of assent by the party to be charged."  *Sullivan v. Sovereign Bancorp, Inc.,* 2001 WL 34883989, *9 (D.N.J. January 19, 2001), *aff'd,* 33 F.3d Appx. 640 (3d Cir. 2002), referencing *Cameron v. Eynon*, 332 Pa. 529, 532 (1939).  "[C]laims based in quasi-contract cannot survive where the Court finds that a valid contractual agreement exists to govern the parties' relations."  *Sullivan*, 2001 WL at *9, referencing *Schott v. Westinghouse Elec. Corp.*, 436 Pa. 279, 290-91 (1969).  Again, the debtor's contractual promises have not been recanted or breached by the debtor.  Hence, but for the CMS settlement issue, it cannot be established, nor is it plausible, that the debtor's conduct initiated an estoppel.[24]  Most pointedly, IJKG was well aware of its jeopardy in undertaking the assigned

---

[24]Both Counts Three and Four are directed to "Defendants"; yet no *conduct or duty* of the secured parties is pled which would support a cause of action.  To the extent that IJKG would seek a priority interest in "gross receipts" of the debtor based upon an argument grounded in equity, IJKG ignores the fundamental point that it has "volunteered" itself into the currently perceived dilemma.  Counts Three and Four shall be dismissed as against the secured parties.

Medicare number.  There was thus no reliance by IJKG on the debtor's promises or conduct in this regard.[25]

Unjust enrichment, as an equitable doctrine, like promissory estoppel, cannot be substituted for an applicable contract.  *See, e.g., Winslow v. Corporate Express, Inc.,* 364 N.J. Super. 128, 143 (App. Div. 2003).  Nevertheless, parallel pleading of express contract claims and unjust enrichment is in certain circumstances proper.  *See, e.g., Caputo v. Nice-Pak Prod.,* 300 N.J. Super. 498, 504-05 (App. Div. 1997).

To make a claim for unjust enrichment the plaintiff must plead facts to establish that the defendant "received a benefit and that retention of that benefit without payment would be unjust."  *VRG Corp. v. GKN Realty Corp.*, 135 N.J. 539, 554 (1994).  "The unjust enrichment doctrine requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights."  *VRG Corp.*, 135 N.J. at 554.  "'A common thread running throughout successful invocation of the doctrine of unjust enrichment is that the plaintiff expected remuneration from the defendant, or if the true facts were known to the plaintiff, he would have expected remuneration from defendant, at the time the benefit was conferred.'" *Commerce Bancorp., Inc.*, 490 F. Supp. 2d at 561 n.7, quoting *Assocs. Commercial Corp. v. Wallia*, 211 N.J. Super. 231, 244 (App. Div. 1986) (internal quotations omitted by *Commerce Bancorp*).

---

[25]It is worth noting that the APA contains a rather usual "entire agreement" provision (at § 13.6), thus blunting, except perhaps as to the 2004 CMS settlement payments, any inference by IJKG that postcontract preclosing conduct of the debtor misled IJKG.  Conduct of the debtor in connection with the CMS settlement is readily distinguishable in terms of satisfying the plausibility standard, as referenced throughout this opinion.

There is a plausible argument advanced by IJKG that its undertaking of the 2004 CMS settlement obligation unjustly enriches the debtor.  This point runs parallel with the plausibility of IJKG's breach of contract point previously preserved (i.e., not deemed subject to dismissal) hereinabove, and as otherwise previously discussed.

The balance of the Count Four claim (speculative, unliquidated and, among other possibilities, having at least the potential, *if allowed*, to "convert" Medicare *prepetition* claims into IJKG's current postpetition/postclosing causes) is not entitled to come under any banner of unjust enrichment.  In short, the debtor would be anything but enriched by the potential (though not certain) "upgrading" of Medicare's prepetition position (now 2002 to the April 2007 petition date).[26]

The 2004 settlement is to be distinguished as having at least colorable administration expense characteristics.  Those emanate, *first* from the debtor's undertaking of prepetition expense obligations under the "doctrine of necessity" (prompted by Medicare's § 553 qualifying setoff rights threatening the debtor's case cash flow), and *second* per the debtor's conduct in the Chapter 11 case.  More generally, the complaint is so highly speculative at this point that, but for the 2004 carve out, it simply constructs a tenuous hypothetical.  That hypothetical, and any actualizing of damage to IJKG, is attributable to its failure to obtain a new Medicare provider number; equitable remedies are not available to IJKG under these circumstances.  And, unlike the factual setting of the claim arising from the 2004 CMS settlement, there is absolutely no

---

[26]As noted early on, the variables involved here ("due to" items, "due from" items, prepetition versus postpetition accruals, preclosing versus postclosing accruals), all could be in play in the future; in fact, the *debtor* could be in jeopardy, given that an *IJKG obligation* could be offset by Medicare against a post-audit "due to" the debtor.

35

conduct attributable to the debtor which would be a counterweight to IJKG's volunteering as an

assignee of the debtor's Medicare number.  As such, dismissal consistent with Counts One and

Two is warranted at this time.

Turning directly to Count Four's prayer for a constructive trust remedy, and focusing

solely on the 2004 settlement claim (along with the footnote 3 reservation, the only other part of

that count to remain viable), that remedy is both unnecessary and disruptive of the bankruptcy

processes preserved in cash collateral orders.[27]  Given that a *potential* administrative claim has

already been addressed, and until the claim and all causes associated with IJKG's payment of the

settlement amount are fully resolved, funds remain available for such administration per the

settlement between the secured creditors[28] and the debtor of September 23, 2008.[29]

---

[27]*See Flanigan v. Munson*, 175 N.J. 597, 608 (2003) ("[O]ur courts employ a two-prong test when determining whether a constructive trust is warranted in a given case. First, a court must find that a party has committed wrongful act.  *D'Ippolito v. Castoro*, 51 N.J. 584, 589 . . . (1968).  The act, however, need not be fraudulent to result in a constructive trust; a mere mistake is sufficient for these purposes. [DAN B. DOBBS, REMEDIES (1973)*, § 4.3, at 243 (observing that 'constructive trust may be used as a remedy for innocent misstatements, or even simple mistakes, as well as a remedy for fraud'). Second, the wrongful act must result in a transfer or diversion of property that unjustly enriches the recipient.") [Citation omitted.]

[28]As with Count Three, "Defendants" are pled against in Count Four; this reference is apparently intended to apply to the secured creditors because Count Four presses for a constructive trust "on all funds received by Debtor postclosing related to Debtor's Medicare Provider Agreement."  Those "gross receipts" (i) have been accounted for throughout the Chapter 11 case (*see* footnote 22 *supra*), (ii) IJKG's assertions against the debtor generally fail, thus foreclosing its derived claims against the secured creditors and their collateral, and (iii) such extraordinary and unfounded recourse to collateral is not necessary to remedy the limited viable causes arising from IJKG's payment of CMS settlement amounts for 2004 (and those preserved in footnote 3, *supra*).

[29]Note that this point applies with equal weight to the constructive trust remedy sought in Count Five (the equitable subrogation cause).

36

E.      __Count Five: Equitable Subrogation to the Rights of Medicare__.

Subrogation rights arise in one of three ways: (1) by agreement; (2) by statute; (3) or as "a judicial 'device of equity to compel the ultimate discharge of an obligation by the one who in good conscience ought to pay it.'" *Culver v. Ins. Co. of N. Am.*, 115 N.J. 451, 456 (1989) (internal citation omitted).  Subrogation does not apply "where its enforcement would be inconsistent with the terms of a contract or when the contract, either expressly or by implication, forbids its application." *Ganger v. Moffett*, 8 N.J. 73, 80 (1951).  "'The rights of the subrogee attach at the time the equities arise in his favor, which ordinarily is at the time he assumes and pays the debt.'" *Schmid v. First Camden Nat'l. Bank & Trust Co.*, 130 N.J. Eq. 254, 269 (Ch. Div. 1941) quoting 60 C.J. § 722, Par. 31F, now 83 C.J.S. *Subrogation* § 19.[30]

As emphasized throughout this opinion, the only known claim of Medicare which has been both liquidated and (partially) paid by IJKG, is for the 2004 settlement.  Yet equitable subrogation requires *payment* by the asserting party, not simply exposure to possible jeopardy. Moreover, the party who pays a debt and seeks subrogation cannot have acted as a volunteer, but rather must have acted under some compulsion which may include protecting its own interests. *Jorge v. Travelers Indem. Co.*, 947 F. Supp. 150, 155 (D.N.J. 1996), citing *First Nat'l City Bank v. United States*, 548 F.2d 928, 936 (Ct. Cl. 1977) and *Prairie State Nat. Bank v. United States*, 164 U.S. 227, 231 (1896).  IJKG *volunteered* to undertake the jeopardy of preclosing liabilities

---

[30]"The rights of a subrogee attach at the time the equities arise in his or her favor, which ordinarily is at the time he or she pays the debt, or when the obligation is pledged to the creditor. The right to subrogation does not mature, however, until the debt is paid in full."  83 C.J.S. *Subrogation* § 19 (footnotes omitted).

due Medicare.  And, no such jeopardy has manifested in current claims, except for the 2004

CMS settlement.

For immediate purposes, this Court has accepted as plausible IJKG's contract and

equitable claims arising out of its undertaking of the debtor's obligations to pay the 2004

settlement amount.   Given the preservation of Counts One through Four in this regard, there is

no need at this point to further particularize as to the equitable subrogation sought in Count Five.

The cause of action will survive at this very preliminary stage as to the CMS settlement

payments by IJKG.  *See also* footnote 3, *supra.*

However, not even the limited surviving aspect of this count (and, of course, not the

dismissed more hypothetical and general claims of IJKG) justify the equitable remedy ("escrow"

or "constructive trust") demanded by IJKG.  That demand, leveled against "Defendants" and

obviously aimed at the secured creditors, includes the setting up of a reserve "from the funds of

Debtor or other property of the Estate that Debtor has collected or will collect, or has been

turned over or is in the possession of the Secured Creditors."  As stated earlier, funds for

administration remain in the estate, the claimed $248,000 in CMS settlement installments

undertaken by IJKG is a manageable sum for this estate, and there is reasonable argument in

favor of those limited complaint contract breach or equitable causes to be viewed as

administration claims.  Nevertheless, and circling back to IJKG's posture as a volunteer having

no counterweighting specifics other than those relating to the CMS settlement of 2004, IJKG's

remedy demands are completely unfounded.  To allow such a remedy would interfere with

secured creditors rights, enhanced and provided for by a series of Court orders, while

38

unaccountably upgrading what in all likelihood would be largely *prepetition*[31] Medicare cost report claims (2002 - April 2007) to superpriority status.[32]  All of this runs counter to basic bankruptcy precepts.  *See e.g.,* 11 U.S.C. §§ 363(a), 364(c)(1), 506, 507 and 553.[33]

     IJKG's Count Five is implausible as to the secured creditors in its entirety (including remedy demands).  It is also implausible as to the debtor, except as to the CMS settlement of 2004 (with remedies limited to standard damage awards), and as otherwise set forth in footnote 3, *supra.*

---

[31]There is a potential for Medicare cost report-based administrative claims, if the debtor was overreimbursed by Medicare estimated payments for services performed from the April 16, 2007 petition date through the February 1, 2008 closing date.

[32]The secured creditors argue that Medicare's setoff rights are limited in the circumstances of this case, and therefore IJKG's position, if allowed, as a subrogee of Medicare would be unavailing.  "The fundamental principle of subrogation is that the subrogee's rights rise no higher than those of the subrogor."  *In re Holloway*, 125 N.J. 386, 398 (1991).  Without affirming this assertion as to setoff against yet *unpaid* Medicare amounts due the debtor, the misguided concept espoused by IJKG that payments of "gross receipts" *already booked* by the debtor and turned over to the secured creditors could be accessed by Medicare, strains credulity. *See, e.g.,* 42 U.S.C. § 1395g(a) and C.F.R. § 405.370.

[33]IJKG has pled for a reconstruction of the APA that awards to it, as an alternative, the "positive" aspects of *Medicare's view* of the provider number assignment.  *See* complaint ¶ 51. ("Alternatively, to the extent that Debtor takes the position that the pre-Closing liabilities  . . . are IJKG's responsibility, IJKG asks that the Court order Debtor to promptly pay to IJKG all monies received by Debtor post-Closing. . . .").  Plainly targeted were Besler and transition amounts due from Medicare, accrued preclosing but paid thereafter.  To the extent those receipts have been booked, the remedy has been denied IJKG per this Opinion.  However, future developments in audit processes going back to 2002, could provide a wild array of possibilities for "due to" and "due from" amounts, Medicare set off rights as interpreted by Medicare, and the same as *might* differ under bankruptcy precepts (as most probably viewed by the secured creditors).  As least from this point forth, a protocol is conceivable which would most closely implement the intent of the APA (unencumbered by IJKG's post-contract failure to obtain its own provider number). Otherwise, the debtor and IJKG each run the risk that Medicare's possibly arbitrary accounting of "pluses" and "minuses" per its single hospital view of Bayonne Medical Center will be damaging.  The Court awaits the parties initiative with respect to such a protocol; without such a mutual effort (and Medicare's participation), the parties are left to their formal future remedies, *if any*, whether within this adversary proceeding or otherwise.

**IV.**     <u>**Conclusion**</u>.

Counts Three, Four and Five of the First Amended Complaint naming "Defendants" and seeking remedies which would recover amounts already received by the debtor and/or secured parties, shall be dismissed as to the secured parties, along with all such remedy requests.

Counts One through Five of the First Amended Complaint shall be dismissed as to the debtor in all respects and as to all remedies, *except* for causes relating to the CMS settlement of 2004, the Smart Solutions and Armanti claims, and those hospital employee claims pled. Moreover, those specifically excepted causes of action shall be limited to damage remedies against the estate of the debtor only (excluding the "constructive trust" or escrow sought to be applied to, or segregation of, funds already received by the debtor or its secured creditors).

This court will issue its Order consistent with this opinion.

Dated:  February 3, 2009                      /s/Morris Stern
                                                                    MORRIS STERN
                                                                    United States Bankruptcy Judge

40